UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

JAMISON REMIED, individually,
and as Representative of a Class of
Participants and Beneficiaries of the
NorthShore University HealthSystem
Tax Deferred Annuity Plan,

      Plaintiff,

      v.

NORTHSHORE UNIVERSITY
HEALTHSYSTEM,

      and

BOARD OF DIRECTORS OF NORTHSHORE
UNIVERSITY HEALTHSYSTEM,

      and

RETIREMENT PLAN ADMINISTRATIVE
COMMITTEE,

      Defendants

Case No. 1:22-cv-2578

CLASS ACTION AMENDED
COMPLAINT FOR CLAIMS
UNDER 29 U.S.C. § 1132(a)(2)

---

**AMENDED COMPLAINT**

---

COMES NOW Plaintiff, Jamison Remied, individually and as a representative of

a Class of Participants and Beneficiaries of the NorthShore University HealthSystem

Tax Deferred Annuity Plan (the "Plan" or "NorthShore University Plan"), by his coun-

sel, WALCHESKE & LUZI, LLC, as and for a claim against Defendants, alleges and

asserts to the best of his knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

**<u>INTRODUCTION</u>**

1. Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2. The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3. The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id. (citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

4. Even in a defined contribution plan in which participants are responsible for selecting their plan investments, ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct *their own independent evaluation* to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530) (emphasis added).

"If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

5.  Defendants, NorthShore University HealthSystem ("NorthShore University"), the Board of Directors of NorthShore University HealthSystem ("Board Defendants"), and the Retirement Plan Administrative Committee ("Committee Defendants") (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 403(b) defined contribution pension plan – known as NorthShore University HealthSystem Tax Deferred Annuity Plan (the "Plan" or "NorthShore University  Plan") – that it sponsors and provides to its employees.

6.  During the putative Class Period (May 16, 2016, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping [and administrative ("RKA"] fees)," *Hughes*,142 S. Ct. at 739-740, and by failing to remove their high-cost recordkeeper, Voya Retirement Insurance & Annuity ("Voya").

7.  Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their fiduciary duty of prudence also by "offer[ing] needlessly expensive investment options," in the form of high-cost funds. *See Hughes*, 142 S. Ct. at 740.

8.      These objectively unreasonable recordkeeping and investment fees cannot be contextually justified, and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

9.      Defendants breached their fiduciary duty of prudence by offering higher cost investments to the Plan's participant when it could have offered the substantially similar investment opportunities at a more reasonable cost, and by causing the Plan participants to pay excessive RKA fees.

10.     Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan RKA and investment services.

11.     ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating recordkeeping fees, as well as selecting and retaining investments, based on what is *reasonable* (not the lowest, cheapest, or average) in the applicable market.

12.     There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016.)

13.     The unreasonable RKA fees paid, as well as the unreasonable selection and retention of Plan investments, inferentially tells the plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

14.     These breaches of fiduciary duty caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they

otherwise should have had in the absence of these unreasonable Plan fees and expenses.

15. To remedy these fiduciary breaches and prohibited transactions, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

17. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

18. Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

19. In conformity with 29 U.S.C. §1132(h), Plaintiffs served the initial Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

20. Plaintiff, Jamison Remied, is a resident of the State of Illinois and currently resides in Evanston, Illinois, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

21.     Plaintiff was a Patient Access Representative at the 4901 Searle Parkway NorthShore University location in Skokie, Illinois, from August 2017 through July 2020. During the Class Period, he was invested in the following Plan investments: Voya Stable Value Option, Dodge & Cox Income Fund, Vanguard Target Retirement 2045 Fund, Vanguard Institutional Index Fund, Class P, Harbor Capital Appreciation Fund, ClearBridge Small Cap Growth Fund, Class IS, and Harding Lovener Institutional Emerging Market Portfolio, Class Z.

22.     Plaintiff has Article III standing to bring this action on behalf of the Plan because he suffered actual injuries to his Plan account through paying excessive recordkeeping fees during the Class Period, those injuries are fairly traceable to Defendants' unlawful conduct in maintaining Voya as its recordkeeper, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiff and Class.

23.     Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond his own injuries, including for high cost funds.

24.     The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive RKA and investment fees) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

25. Having never managed a mega 403(b) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets,") Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

26. NorthShore University HealthSystem ("NorthShore University"), headquartered at 1301 Central Street, Evanston, IL 60201, includes six hospitals – Evanston, Glenbrook, Highland Park, Northwest Community, Skokie, and Swedish. NorthShore University includes a 900-physician multispecialty group practice, NorthShore Medical Group, with more than 140 locations in the Chicago area. NorthShore University has annual revenues of $3.2 billion and employs 17,000 people. In this Complaint, "NorthShore University" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

27. NorthShore University acted through its officers, including the Board of Directors ("Board Defendants"), to perform Plan-related fiduciary functions in the course and scope of their business. NorthShore University and its Board appointed other Plan fiduciaries on the Committee, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, NorthShore University and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

28.     The Retirement Plan Administrative Committee ("Committee Defendants") is the Plan Administrator. As the Plan Administrator, Committee Defendants are fiduciaries with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). Committee Defendants have authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

29.     The Plan is a Section 403(b) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that NorthShore University's contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

30.     In 2020, the Plan had about $1,793,319,571 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding Plan fees and expenses. Defendants, however, did not regularly monitor Voya to ensure that Voya, and the Plan investments and services selected, remained the prudent and objectively reasonable choice.

31.     With 11,669 participants in 2020, the Plan had more participants than 99.85% of the defined contribution plans in the United States that filed 5500 forms for the 2020 Plan year. Similarly, with $1,793,319,571 in assets in 2020, the Plan had more assets than 99.90% of the defined contribution plans in the United States that filed 5500 forms for the 2020 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE
## DEFINED CONTRIBUTION INDUSTRY

32.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

33.     Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

34.     Although NorthShore University contributed significant amounts in employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping fees or investment fees.

35.     While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are thus a significant factor that affect plan participant's investment returns and impact their retirement income.

36.     Employers must consider the fees and expenses paid by a plan. Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.

37.     Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and

other plan expenses are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be appropriate choices.

**Recordkeeping Services**

38. Defined contribution plan fiduciaries of mega 403(b) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans. Voya is one such recordkeeper.

39. These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard, bundled offerings of the same level and quality.

40. There are two types of essential RKA services provided by all recordkeepers. For mega plans with substantial bargaining power (like the Plan), the first type, "Bundled RKA," is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis.) The Bundled RKA services include the following standard services:

a. Recordkeeping;

b. Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c. Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e. Maintenance of an employer stock fund (if needed);

f. Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g. Plan consulting services including assistance in selecting the investments offered to participants;

h. Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

i. Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

j. Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

41. The second type of essential RKA services, hereafter referred to as "Ad Hoc RKA" services, provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees).

42. These "Ad Hoc RKA" services typically include:

a. Loan processing;

b. Brokerage services/account maintenance;

c.    Distribution services; and

d.    Processing of Qualified Domestic Relations Orders (QDROs).

43.    Industry experts have observed that for mega plans, like the NorthShore University Plan, any minor variations in the level and quality of RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

44.    All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RKA services.

45.    The vast majority of fees earned by recordkeepers typically come from the bundled fee for providing the Bundled RKA services as opposed to the Ad Hoc RKA services.

46.    Because dozens of Recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons.

47.    Plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fee rates proposed by recordkeepers.

48.    Plan fiduciaries routinely request bids from recordkeepers by asking what the recordkeeper's Bundled RKA revenue requirement is to administer the

plan. And they request that the Bundled RKA revenue requirement be expressed as either a flat per participant fee rate or an asset-based fee rate.

49. While there may be minor differences in the way the Bundled RKA services are delivered, those differences are deemed immaterial to the price comparisons in virtually all cases.

50. Whether the minor differences be in the number of staff utilized for call center support, the frequency of participant communications, or the number of investment education sessions held by the plan sponsor, industry experts have states that these differences are immaterial when considering the level and quality of services provided by the plan from a cost perspective.

51. The NorthShore University Plan had a standard package of Bundled RKA services, providing RKA services of a nearly identical level and quality to other recordkeepers who service other mega plans.

52. There is nothing in the service and compensation codes disclosed by the Plan Fiduciaries in their Form 5500 filings during the Class Period, nor anything disclosed in the Participant section 404(a)(5) fee and service disclosure documents, that suggests that the annual "recordkeeping and administrative services" charged to participants included any services that were unusual or above and beyond the standard recordkeeping and administrative services provided by all national recordkeepers to mega plans.

53. Accordingly, the disparity between the Plan's Bundled RKA fee, and the fee paid by several other similarly sized plans for the total RKA services, cannot be

explained by any additional services, or the quality of those services, provided by Voya to the Plan.

54. Indeed, because the comparisons are between Bundled RKA fees paid by the Plan versus Total RKA fees by similar plans, this comparison underestimates the excess amounts charged by Voya to the Plan.

55. Because recordkeepers offer the same bundles and combinations of services as their competitors, the market for defined contribution retirement plan services has become increasingly price competitive for plans that have a sizable number of participants.

56. Over the past twenty years, the fees that recordkeepers have been willing to accept for providing retirement plan services has significantly decreased, partially because of the success of class fee litigation. Recordkeepers are willing (or competitively required) to accept a lower and more competitive fee as a result of, among other things, the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures.

57. By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the NorthShore University Plan. In other words, reasonable recordkeeping fees paid in 2018 are representative of the reasonable fees during the entire Class Period.

58. The underlying cost to a recordkeeper of providing recordkeeping to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan. As a plan gains more

participants, the reasonable market rate for the services provided by the record-keeper will decline.

59. The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

60. As a result, recordkeepers make separate contractual arrangements with mutual fund providers. For example, recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

61. Recordkeepers typically collect their fees through direct payments from the plan or through indirect compensation such as revenue sharing, or some combination of both.

62. Regardless of the pricing structure that the plan fiduciary negotiates with a service provider, and Plaintiffs express no preference, the amount of compensation paid to service providers, including the recordkeepers, must be reasonable (not the *lowest*, *cheapest*, or *average*) given the applicable market.

63. As a result, plan fiduciaries must understand the total dollar amounts paid to the recordkeeper and be able to determine whether the compensation is objectively reasonable by understanding the market for such recordkeeping services.

<u>Investments</u>

64. Plan fiduciaries of a defined contribution plan have a continuing and

regular responsibility to select and monitor all investment options they make available to Plan participants.

65.     The primary purpose in selecting plan investments is to give all participants the opportunity to create an appropriate asset allocation under modern portfolio theory by providing diversified investment alternatives.

66.     In selecting different investment options to make available to plan participants, plan fiduciaries are held to the prudent investor standard when choosing investment managers or, alternatively, choosing index investment options.

67.     When choosing an active investment option, the analysis is focused on determining whether the portfolio manager is likely to outperform an appropriate benchmark. Thus, the primary emphasis when choosing an active investment option to make available to plan participants is the skill of the portfolio manager.

### THE PLAN

68.     During the entire Class Period, the Plan received recordkeeping services from Voya.

69.     At all relevant times, the Plan's RKA fees were objectively unreasonable and excessive when compared with other comparable 401(k) and 403(b) plans offered by other sponsors that had similar numbers of plan participants.

70.     The fees were also excessive relative to the level and quality of recordkeeping services received because industry experts have observed that the same level

and quality of services are generally offered to mega plans, like the NorthShore University Plan, regardless of the number or level of services selected by the Plan and regardless of the specific service codes utilized by the plan on the Form 5500.

71. It is clear based on the 5500 forms and 404(a)(5) participant disclosures that Voya provided the same services as the standard package of RKA services provided by all recordkeepers to mega plans and did not provide any higher level or quality of services.

72. These excessive Bundled Plan RKA fees led to lower net returns than participants in comparable 401(k) and 403(b) plans enjoyed.

73. During the Class Period, Defendants breached their duty of prudence owed to the Plan, to Plaintiff, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for RKA services.

74. Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiff and members of the Class millions of dollars of harm to their Plan accounts.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING ITS RECORDKEEPER

75. A plan fiduciary is required to fully understand all sources of revenue received by its recordkeeper. It must regularly monitor that revenue to ensure that the compensation received is, and remains, reasonable for the quality and level of services provided.

76. Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, through soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan.

77. Prudent plan fiduciaries can easily and inexpensively receive a quote from other recordkeepers to determine if their current level of Bundled RKA fees is reasonable in light of the level and quality of recordkeeper services.

78. Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive, reasonable fee if necessary.

79. A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated Bundled RKA fees. To receive a truly "reasonable" Bundled RKA fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis (about every 3 years).

80. Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

81. First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the record-

keeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

82. Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

83. Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

84. Accordingly, the only way to determine the *reasonable*, as opposed to the *lowest, cheapest,* or *average*, market price for a given quality and level of recordkeeping services is to obtain competitive bids from other providers in the market.

## PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR RKA FEES AND THE PLAN PAID UNREASONABLE RKA FEES

85. A plan fiduciary must continuously monitor its Bundled RKA fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

86. During the Class Period, Defendants failed to regularly monitor the Plan's Bundled RKA fees paid to its recordkeepers, Voya.

87.     During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Voya, in order to avoid paying unreasonable Bundled RKA fees.

88.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was done ineffectively given the objectively unreasonable Bundled RKA fees it paid to Voya, and in light of the level and quality of recordkeeper services it received from Voya.

89.     From the years 2016 through 2020, the table below shows the actual year-end participants and annual RKA fees, illustrating that the Plan had on average 10,383 participants with account balances and paid an average effective annual Bundled RKA fee of at least approximately $953,966, which equates to an average of at least approximately $92 per participant. These are the minimum amounts that could have been paid:

### Bundled Recordkeeping and Administration (Bundled RKA) Fees

|  | 2016 | 2017 | 2018 | 2019 | 2020 | Average |
|---|---|---|---|---|---|---|
| Participants | 9,536 | 10,021 | 10,221 | 10,469 | 11,669 | 10,383 |
| Est. RKA Fees | $886,848 | $989,562 | $924,633 | $963,811 | $1,004,976 | $953,966 |
| Est. RKA Per Participant | $93 | $99 | $90 | $92 | $86 | $92 |

90.     From the years 2016 through 2020, the table below illustrates the annual *Total* RKA fees (Bundled and Ad Hoc) paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual Bundled RKA fees paid by the Plan (as identified in the table above):

| Plan | Partici-pants | Assets | RKA Fee | RKA Fee /pp | Record-keeper | Graph Color |
|---|---|---|---|---|---|---|
| The Boston Consulting Group, Inc. Employees' Savings Plan And Profit Sharing Retirement Fund | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard | White |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,902 | $904,717,349 | $322,496 | $36 | Fidelity | White |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price | White |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West | White |
| **Northshore Plan Average Fee** | **10,383** | **$1,438,299,630** | **$953,966** | **$92** | **Voya** | **Red** |
| Southern California Per-manente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |
| Viacom 401(K) Plan | 12,196 | $1,249,874,734 | $376,314 | $31 | Great-West | White |
| Fortive Retirement Sav-ings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity | White |

91.     From the years 2016 through 2020, the graph below illustrates the annual *Total* RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual Bundled RKA fees paid by the NorthShore Plan (as identified in the table above), with the white data points representing Total RKA fees that recordkeepers offered to (and were accepted by) comparable plans.



92. From the years 2016 to 2020, the table and graph above illustrate that the Plan paid an effective average annual Bundled RKA fee of at least $92 per participant for RKA.

93. Comparing the Bundled RKA fees of the NorthShore Plan with the Total RKA fees (Bundled + Ad Hoc) of the comparator plans means that the chart above significantly underestimates the excessive RKA fees paid by the NorthShore Plan to Voya during the Class Period.

94. As noted above, the more participants a plan has, the lower the effective fee per participant that recordkeepers are willing to provide. The trend line in the graph represents a per participant fee rate for a given number of participants around which a plan fiduciary would expect to receive initial bids for the Bundled RKA services.

95. The fact that the amount paid by the NorthShore Plan to Voya for RKA services *increased* during the Class Period, while the number of participants *increased*, is yet another indicia of the imprudence of Defendants' fiduciary process in continuing to contract with Voya throughout the Class Period.

96. When a plan fiduciary follows prudent practices as outlined by the Department of Labor ("DOL"), and solicits bids from several recordkeepers in a competitive environment, some initial bids for the Bundled RKA services would be below the trend line and others would be above the trend line. Ultimately, a prudent plan fiduciary should be able to negotiate a Bundled RKA fee lower than the trend line such that the total RKA fee would be proximate to the trend line.

97. From the years 2016 through 2020, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual RKA fee of around $34 per participant, if not lower.

98. From the years 2016 through 2020, and as also compared to other plans of similar sizes with similar amounts of money under management, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $953,966 per year in Bundled RKA fees, which equated to an effective average of approximately $92 per participant per year.

99. From the years 2016 through 2020, and as also compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, had Defendants been acting prudently, the Plan actually would have paid on average a reasonable effective annual market rate for

Bundled RKA of approximately $353,029 per year, which equates to approximately $34 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay *almost three times* what they could otherwise pay for Bundled RKA.

100. From the years 2016 through 2020, the Plan additionally cost its participants on average approximately $600,937 per year in Bundled RKA fees, which equates to on average approximately $58 per participant per year.

101. From the years 2016 to 2020, and because Defendants did not act prudently, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $3,004,686 in unreasonable and excessive Bundled RKA fees.

102. From the years 2016 to 2020, because Defendants did not act prudently, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of $4,212,101 in excessive Bundled RKA fees.

103. Alternatively, the chart below shows several examples of Bundled RK&A Fee rates from other comparable plan's Participant Fee Disclosures (404a-5's). The equivalent Bundled RK&A Fee Rate (%) column can be compared to the 0.064% as shown on the Northshore University Participant Fee disclosures from 2016 to 2020. The 0.064% Bundled RK&A Fee rate is equivalent to an average $89/pp for

the years 2016 to 2020 compared to $27/pp when compared to the other plans show in the chart above.

**Bundled RK&A Fee Rates**

| Plan | Participants | Assets | Bundled RK&A Fee Rate ($ /pp) | Equivalent Bundled RK&A Fee Rate (%) | Recordkeeper |
|---|---|---|---|---|---|
| Trinity Health 403(B) Retirement Savings Plan | 1,501 | $429,131,672 | $30 | 0.0105% | Fidelity |
| **Northshore University Plan Average Bundled RK&A Fee** | **10,383** | **$1,438,299,630** | **$89** | **0.0640%** | **Voya** |
| Team Health 401(k) | 17,585 | $1,144,142,462 | $25 | 0.0384% | Schwab |
| Beaumont Health 403(b) Plan | 36,916 | $2,098,360,517 | $28 | 0.0493% | Fidelity |
| General Dynamics Corporation 401(K) Plan 6.0 | 45,018 | $8,193,372,264 | $25 | 0.0137% | Fidelity |



104.    From the years 2016 to 2020, and because Defendants did not act prudently, and as compared to other plans of similar sizes, receiving a similar level and quality of services, under the 404a-5 model, the Plan actually cost its participants a total minimum amount of approximately $3,200,827 in unreasonable and excessive Bundled RKA fees.

105. From the years 2016 to 2020, because Defendants did not act prudently, and as compared to other plans of similar sizes, receiving a similar level and quality of services, under the 404a-5 model, the Plan actually cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of $4,336,574 in excessive Bundled RKA fees.

106. Under either comparison model, Defendants could have offered the exact same recordkeeping and related administrative services, at the same level and quality, at a more reasonable cost by using a different recordkeeper, but did not do so.

107. Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, no reasonable tradeoffs existed here because recordkeepers for mega plans are providing the exact same level and quality of services, as industry experts have observed.

108. Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeepers, Voya, and Defendants could have obtained the same RKA services for less from other, similar recordkeepers.

109. The higher cost Bundled RKA selected by Defendants were substantially identical to lower-cost Bundled RKA available in the pertinent marketplace as highlighted by the chart above.

110.     Plaintiff paid these excessive Bundled RKA fees in the form of direct compensation to the Plan and suffered injuries to his Plan account as a result.

111.     Plaintiff has participated in several 401(k) and 403(b) plans from a number of employers and there have been no material differences in the Bundled RKA services that they have received.

112.     During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the Bundled RKA fees it paid to Voya vis-à-vis the fees that other recordkeepers would charge, and would have accepted, for the same level and quality of services.

113.     During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's Bundled RKA fees it paid to Voya, but Defendants either simply failed to do so, or did so ineffectively given that it paid nearly triple for Bundled RKA fees than it should have.

114.     During the entirety of the Class Period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the Bundled RKA fees it paid to Voya, it would have realized that the Plan was compensating Voya unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan participants, and therefore should have removed Voya as an imprudent selection during the Class Period.

115. The Plan Bundled RKA fees were also excessive relative to the record-keeping and related administrative services received, since the quality and level of such services are standard for mega 401(k) and 403(b) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. Any difference in Bundled RKA fees between comparable Plans is not explained by the level and quality of services each recordkeeper provides.

116. The market for RKA services for mega plans, like the NorthShore University Plan, is such that all national recordkeepers can provide all the required services that a mega plan might need. Any differences in the quality or scope of the services delivered are immaterial to the difference between what the Plan paid for Bundled RKA services and what the reasonable fair market fee was for substantially identical services.

117. During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Bundled RKA fees than they should have been and/or by failing to take effective remedial actions including removing Voya as the Plan recordkeeper, Defendants breached their fiduciary duty of prudence to Plaintiff and Plan participants.

<u>STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING<br>& MONITORING INVESTMENT OPTIONS</u>

118. For all practical purposes, there is a commonly accepted process to select and monitor investment options which is based on modern portfolio theory and the prudent investor standard.

119. Under ERISA, plan fiduciaries are required to engage investment consultants or advisors to the extent that the plan fiduciaries do not have the investment expertise necessary to select and monitor investments under modern portfolio theory.

120. That accepted process involves evaluating the performance history, tenure, and stability, of the current portfolio manager, the risk adjusted returns, and the fees.

121. Although there is nothing inappropriate in having active investment options as a plan investment options, when an active investment option is chosen, one of the most critical aspects of the analysis is to choose a portfolio manager because it is the skill of the portfolio manager that differentially impacts the performance of the investment.

122. From the perspective of a plan participant, the other critical component of the analysis is the fees. The "total expense ratio" of an investment option is often comprised of multiple different types of fees, only one of which is specifically associated with the fee of the actual portfolio manager.

123. As a result, a plan fiduciary is required to understand the interrelationship between the pricing structure it has negotiated with the recordkeeper for recordkeeping services as well as the different fee components of the investment options selected to be made available to plan participants.

## THE PLAN'S INVESTMENT IN HIGH-COST FUNDS

124. *Hughes v. Northwestern Univ.* holds that every investment on an ERISA plan's menu must be prudent, and "participants' ultimate choice over their

investments [does not] excuse allegedly imprudent decisions by [fiduciaries]." 142 S. Ct. at 742.

125. During the Class Period, the chart below identifies several investment options that Defendants selected and/or made available to Plan participants as compared to prudent alternative and less expensive options in the same asset category with the same investment approach.

| Defendants' Investment | | | | | Prudent Alternative Investments | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| HLMEX | Harding Loevner Instl Emerg Mkts I | 1.10% | 0.10% | 1.00% | RNWGX | American Funds New World R6 | 0.57% | 0.00% | 0.57% | 75% |
| LSVEX | LSV Value Equity | 0.65% | 0.00% | 0.65% | RMFGX | American Funds American Mutual R6 | 0.27% | 0.00% | 0.27% | 141% |
| NRGSX | Neuberger Berman Genesis R6 | 0.74% | 0.00% | 0.74% | ODIIX | Invesco Discovery R6 | 0.63% | 0.00% | 0.63% | 17% |
| TBCIX | T. Rowe Price Blue Chip Growth I | 0.56% | 0.00% | 0.56% | JLGMX | JPMorgan Large Cap Growth R6 | 0.44% | 0.00% | 0.44% | 27% |
| VYAXX | Voya Government Money Market A | 0.40% | 0.15% | 0.25% | VUSXX | Vanguard Treasury Money Market Investor | 0.09% | 0.00% | 0.09% | 178% |
| VYSEX | Voya Small Company R6 | 1.03% | 0.00% | 1.03% | MSCDX | MassMutual Small Cap Opps R5 | 0.75% | 0.15% | 0.60% | 72% |
| | Average | 0.75% | 0.04% | 0.71% | | Average | 0.46% | 0.03% | 0.43% | 85.06% |

126. During the Class Period and based on the chart above, the average net expense ratio of the investments selected and made available to Plan participants by the Plan fiduciaries identified above was 0.71%, or 71 basis points.

127. During the Class Period and based on the charts above, the investment options selected by the Plan fiduciaries were 85.06% more expensive than prudent alternative and less expensive options covering the same asset category and same investment approach.

128. During the Class Period, Defendants did not engage in an objectively reasonable process when selecting funds for the Plan.

129. During the Class Period and had Defendants been acting prudently, Defendants would have selected funds with more reasonable expense ratios than those funds actually selected by Defendants, such as the ones identified in the chart above.

130. During the Class Period, Plaintiff had no knowledge of Defendants' process for selecting investments and regularly monitoring them to ensure they remained prudent.

131. During the Class Period, Plaintiff had no knowledge of how the fees charged to and paid by the Plan participants compared to any other funds.

132. During the Class Period, Plaintiff did not know about the availability of lower-cost and better-performing (and other essentially identical) investment options that Defendants failed to reasonably offer because Defendants provided no comparative information to allow Plaintiff to evaluate and compare Defendants' investment options.

133. During the Class Period, Defendants failed to consider materially similar but less-costly alternatives to the Plan's investment options. The chart above demonstrates that the expense ratios of the Plan's investment options between the years 2015 to 2020 were more expensive by significant multiples of comparable actively managed, alternative funds in the same investment style. A reasonable investigation would have revealed the existence of these alternatives.

134.     During the Class Period and because Defendants failed to act prudently by engaging in an objectively reasonable investigation process when selecting its investments, resulting in the selection of unreasonable fund selections, Plaintiff and the Plan's participants incurred objectively unreasonable investment expenses and costs.

135.     During the Class Period, and had Defendants acted prudently by engaging in an objectively reasonable investigation process when selecting its investments, Defendants would have chosen lower-cost investment alternatives.

136.     During the Class Period and because Defendants failed to act prudently by engaging in an objectively reasonable investigation process when selecting its investments, Defendants caused objectively unreasonable and unnecessary losses to Plaintiff and the Plan's participants in the amount of approximately $3,923,297 through 2020 and as detailed in the following chart:

| Actual Investment Lineup | | | | | |
|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 |
| Net Investment Expense to Retirement Plans | $5,326,241 | $6,080,787 | $5,668,307 | $6,573,897 | $7,445,365 |
| **Prudent Alternative Investments** | | | | | |
| Net Investment Expense to Retirement Plans | $4,809,761 | $5,478,518 | $5,170,665 | $5,977,871 | $6,835,212 |
| Est. Investment Damages | $516,480 | $602,268 | $497,642 | $596,026 | $610,153 |
| Compounding Percentage (VIIIX) | | 21.82% | -4.41% | 31.48% | 18.41% |
| Est. Cumulative Investment Damages | $516,480 | $1,231,445 | $1,674,780 | $2,798,027 | $3,923,297 |

137.     During the entirety of the Class Period and by failing to engage in an objectively reasonable investigation process when selecting its investments, Defendants breached their fiduciary duties of prudence to Plaintiff and Plan participants,

causing millions of dollars of losses to their retirement accounts.

**CLASS ACTION ALLEGATIONS**

138.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

139.    In acting in this representative capacity, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the NorthShore University HealthSystem Tax Deferred Annuity Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning May 16, 2016 and running through the date of judgment.

140.    The Class includes approximately 12,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

141.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b.    Whether Defendants breached their fiduciary duties to the Plan;

c. What are the losses to the Plan resulting from each breach of fiduciary duty; and

d. What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty and engaging in prohibited transactions.

142. Plaintiffs' claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were Participants during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

143. Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they are Participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

144. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

145. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

146. Plaintiffs' attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

147. The claims brought by the Plaintiffs arise from fiduciary breaches and prohibited transactions as to the Plan in its entirety and do not involve mismanagement of individual accounts.

148. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

149. Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

150. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and

where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

## FIRST CLAIM FOR RELIEF
### Breach of Duty of Prudence of ERISA, as Amended
### (Plaintiff, on behalf of himself and Class, Against Committee Defendants – Bundled RKA Fees)

151. Plaintiff restates the above allegations as if fully set forth herein.

152. Committee Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

153. 29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Committee Defendants in their administration of the Plan.

154. Committee Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges objectively reasonable Bundled RKA fees.

155. During the Class Period, Committee Defendants had a fiduciary duty to do all of the following: ensure that the Plan's Bundled RKA fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

156. During the Class Period, Committee Defendants breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's Bundled RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

157. During the Class Period, Committee Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper, Voya, to make

sure it was providing the Bundled RKA services at reasonable costs, given the highly competitive market surrounding recordkeeping and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeeper if it provided Bundled RKA services at objectively unreasonable costs.

158. During the Class Period, Committee Defendants breached their duty to Plan participants, including Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's Bundled RKA fees critically or objectively in comparison to other recordkeeper options.

159. Through these actions and omissions, Committee Defendants breached their fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

160. Committee Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

161. As a result of Committee Defendants' breach of fiduciary duty of prudence with respect to the Plan's Bundled RKA fees, the Plaintiff and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

162. Committee Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the NorthShore University Plan the losses resulting from

the breaches, to restore to the Plan any profits Committee Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Committee Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

<u>SECOND CLAIM FOR RELIEF</u>
Breaches of Duty of Prudence of ERISA, as Amended
(Plaintiff, on behalf of himself and Class, Against Committee
<u>Defendants – Investment Management Fees)</u>

163. Plaintiff restates the above allegations as if fully set forth herein.

164. Committee Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

165. 29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Committee Defendants in managing the investments of the Plan.

166. Committee Defendants, as fiduciaries of the Plan, are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

167. During the Class Period, Committee Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan in a prudent manner; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

168. During the Class Period, Committee Defendants breached their fiduciary duties of prudence to Plan Participants, including Plaintiff, by failing to manage

the assets of the Plan in a prudent manner, defray reasonable expenses of administering the Plan, act with the care, skill, diligence, and prudence required by ERISA.

169. Committee Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess whether the Plan's investments were prudent choices for the Plan and to remove imprudent investment options regardless of how long those investments had been in the Plan.

170. During the Class Period, Committee Defendants breached their fiduciary duties of prudence to Plan Participants, including Plaintiff, by failing to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period.

171. Committee Defendants were directly responsible for ensuring that the Plan's investment management fees were reasonable, selecting investment options in a prudent fashion in the best interest of Plan participants, prudently evaluating and monitoring the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

172. Committee Defendants failed to employ a prudent process by failing to evaluate the cost and performance of the Plan's investments and fees critically or objectively in comparison to other more reasonable investment options. Defendants selected and retained for years as Plan investment options mutual funds with high expenses relative to other investment options that were readily available to the Plan at all relevant times in the same asset category and with the same investment approach.

173. Committee Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

174. As a result of Committee Defendants' breach of their fiduciary duties of prudence with respect to the Plan with regard to high cost funds, the Plaintiff and Plan participants suffered unreasonable and unnecessary monetary losses.

175. Committee Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Committee Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Committee Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

<u>THIRD CLAIM FOR RELIEF</u>
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against Defendant NorthShore University**
**<u>and Board Defendants – Bundled RKA Fees</u>)**

176. Plaintiff restates the above allegations as if fully set forth herein.

177. Defendant NorthShore University and Board Defendants had the authority to appoint and remove members or individuals responsible for Plan Bundled RKA fees on the Retirement Plan Administration Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

178. In light of this authority, Defendant NorthShore University and Board Defendants had a duty to monitor those individuals responsible for Plan Bundled RKA fees on the Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

179. Defendant NorthShore University and Board Defendants had a duty to ensure that the individuals responsible for Plan Bundled RKA fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant NorthShore University and Board Defendants.

180. The objectively unreasonable and excessive recordkeeping fees paid by the Plan inferentially establish that Defendant NorthShore University and Board Defendants breached their duty to monitor by, among other things:

  a. Failing to monitor and evaluate the performance of individuals responsible for Plan recordkeeping fees on the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably Bundled RKA fees;

  b. Failing to monitor the process by which the Plan's recordkeeper, Voya, was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

  c. Failing to remove individuals responsible for Plan recordkeeping fees on the Committee whose performance was inadequate in that these individuals continued to pay the same Bundled RKA fees even though solicitation of competitive bids would have shown that maintaining Voya as

the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of Plan participants' retirement savings.

181. As the consequences of the breaches of the duty to monitor for Bundled RKA fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

182. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendant NorthShore University and Board Defendants are liable to restore to the NorthShore University Plan all losses caused by their failure to adequately monitor individuals responsible for Plan Bundled RKA fees on the Committee. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

### FOURTH CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
(Plaintiff, on behalf of himself and Class, Against Defendant NorthShore
University and Board Defendants – Investment Management Fees)**

183. Plaintiff restates the above allegations as if fully set forth herein.

184. Defendant NorthShore University and Board Defendants had the authority to appoint and remove members or individuals responsible for Plan investment management fees on the Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

185. In light of this authority, Defendant NorthShore University and Board Defendants had a duty to monitor those individuals responsible for Plan investment management fees on the Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

186. Defendant NorthShore University and Board Defendants had a duty to ensure that the individuals responsible for Plan investment management fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant NorthShore University and Board Defendants.

187. The objectively unreasonable and excessive investment management fees paid by the Plan inferentially establish that Defendant NorthShore University and Board Defendants breached their duty to monitor by, among other things:

   a. Failing to monitor and evaluate the performance of individuals responsible for Plan investment management fees on the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably investment management expenses;

   b. Failing to monitor the process by which the Committee investigated the availability of more reasonably-priced investment management fees; and

   c. Failing to remove individuals responsible for Plan investment management fees on the Committee whose performance was inadequate in that these individuals continued to pay the same investment management costs even though solicitation of competitive bids would have shown that maintaining those high-cost funds, was imprudent, excessively costly, all to the detriment of Plan participants' retirement savings.

188. As the consequences of the foregoing breaches of the duty to monitor for investment management fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

189.     Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendant NorthShore University and Board Defendants are liable to restore to the NorthShore University Plan all losses caused by their failure to adequately monitor individuals responsible for Plan investment management fees on the Committee. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.      A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable Bundled RKA fees and investment management costs, and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An Order requiring NorthShore University to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against NorthShore University as necessary to effectuate relief, and to prevent NorthShore University's unjust enrichment;

F.      An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.	Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.	An award of pre-judgment interest;

I.	An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.	Such other and further relief as the Court deems equitable and just.


Dated this 12th day of September, 2022	**WALCHESKE & LUZI, LLC**

<u>s/Paul M. Secunda</u>
James A. Walcheske
Paul M. Secunda
125 S. Wacker Dr., Suite 300
Chicago, Illinois 60606
Telephone: 224-698-2630
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com

*Attorneys for Plaintiff*