## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JAMISON REMIED, individually, and as Representative of a Class of Participants and Beneficiaries of the NorthShore University HealthSystem Tax Deferred Annuity Plan, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 22-cv-2578 |
| v. | ) ) | Hon. Steven C. Seeger |
| NORTHSHORE UNIVERSITY HEALTHSYSTEM, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Jamison Remied saved for retirement as an employee of NorthShore University HealthSystem by contributing to its defined contribution plan. He later filed suit against the company, its CEO, and two committees that administer the Plan, bringing a collection of claims under ERISA. Remied alleges that Defendants breached their duty of prudence by paying excessive recordkeeping fees and including high-cost investment funds in the Plan offerings.

Defendants moved to dismiss. For the reasons stated below, the motion to dismiss is granted in part and denied in part.

### Background

At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast

the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

The case is about the management of an ERISA retirement plan. Before diving into the facts, the Court will offer a short overview of what those plans are, and how they work.

### *Defined Contribution Plans*

Employees often save for retirement by contributing to their employer's defined contribution plan. Basically, employees can set aside a hunk of their paychecks during each pay period, and save it for a rainy day in retirement.

They're called defined contribution plans because the employee sets aside a specific amount of money. That is, the amount of the contribution is defined, in advance, by the employee. A 401(k) plan is a good example.

A defined contribution plan has a lot of upside for an employee. For starters, the employee saves pre-tax dollars, and the investments grow on a tax-free basis while inside the account. All else being equal, paying taxes tomorrow is better than paying taxes today (except for the good people in the Treasury Department). Plus, many employers match the contributions, so employees potentially can double their money. The deductions are automatic, too, so employees can save for retirement without having to think much about it.

The employee decides how much to contribute (up to a limit), so the contributions are knowable in advance. But the benefits are not. *See* Second Am. Cplt., at ¶ 29 (Dckt. No. 29). The plan invests the employee's money, and the eventual payout depends on the performance of the investments over time.

Fees and expenses also play a role when it comes to the payout to the employee. The investments might grow over time, especially as an employee makes additional contributions.

But fees and expenses can take a bite out of the growth, and can reduce the investment returns to the employee. *Id.* at ¶ 35. Any money that goes to expenses is money that isn't going to the employee.

The value of the investments is "determined by the market performance of employee and employer contributions, less expenses." *Id.* (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015)). The contributions are certain, but the payouts are uncertain.

Employees have some control, but not complete control, over where their money goes. They can select the investments, but they have to select from the options offered by the plan. The plan offers a menu of possibilities, and the employees have to order off of the investment menu.

Each plan is run by plan administrators, who oversee the day-to-day operations. Administrators often retain outsiders to help run various parts of the plan. The administrators also select the investments that employees can choose from when investing their money.

The plan administrators owe a fiduciary duty to the participants. That fiduciary duty is at the crux of the case.

### *Recordkeeping Services*

One of the expenses of running a defined contribution plan is the cost of recordkeeping services. Plans often hire service providers called – you guessed it – "recordkeepers" that bundle essential recordkeeping and administrative services for large retirement plans. *Id.* at ¶¶ 37–38. For those of you who crave acronyms, they're called "RKA" services.

In the retirement plan services industry, there is no material difference between the services offered by the different national recordkeepers. *Id.* at ¶ 48. According to sources in the industry, as well as some service providers, bundled RKA services are a commodity with little

variation in price. *Id.* at ¶ 59. So service providers can distinguish themselves by how they deliver their RKA services. For example, service providers could provide different levels of customer service, or customize offerings.

Service providers "deliver all the essential . . . RKA services through standard bundled offerings of the same level and quality as other record keepers who service . . . plans," like NorthShore's Plan. *Id.* at ¶ 38. They provide RKA services through standard bundled offerings.

There isn't much difference between the bundles of services offered by the different providers. So plan fiduciaries typically use the "bundled RKA" fee rate to compare different recordkeepers and determine whether a fee rate is reasonable. *Id.* at ¶¶ 54, 65.

According to the complaint, "it is axiomatic in the retirement plan services industry that the more participants in a plan, the lower the effective RKA fee per participant the plan can negotiate. All prudent plan fiduciaries and their consultants and advisors are aware of this industry dynamic." *Id.* at ¶ 43.

Recordkeepers also can provide recordkeeping services to the investment managers of investment options in a plan. *Id.* at ¶ 69. In that case, recordkeepers may also collect a portion of the total expense ratio fee for the investment option. *Id.* This practice is referred to as "revenue sharing" or "indirect compensation." *Id.* at ¶ 70.

### *Investment Options*

Plan fiduciaries invest the contributions on behalf of the employees. *See* Dep't of Labor, *Types of Retirement Plans*, https://www.dol.gov/general/topic/retirement/typesofplans (last visited June 28, 2024). But the employees choose where their money goes, up to a point. They have to choose from a smorgasbord of investment options offered by the plan.

The fiduciaries set the menu, by selecting the investments that employees can choose. *See* Second Am. Cplt., at ¶ 73 (Dckt. No. 29). The employees pick from those options and select investments that are right for them, taking into account things like asset allocation and diversification. *Id.* at ¶ 74.

Basically, employees choose their investments by picking from a menu. And the fiduciaries decide what's on the menu.

Fiduciaries have a responsibility to monitor the investment options that they make available to the participants. *Id.* at ¶ 73. The so-called "prudent investor" standard applies to fiduciaries when choosing investment options. *Id.* at ¶ 75. They have to remove unpalatable options from the menu.

One way to evaluate investment options is to look at a fund's expense ratio. Expensive funds have a high expense ratio. *Id.* at ¶ 150. The total expense ratio of an investment option is often comprised of multiple different types of fees. *Id.* at ¶ 143.

***The Lawsuit***

That's a rough sketch of defined contribution plans. With that background in mind, the Court turns to the facts of the case.

Jamison Remied is a former employee of the NorthShore University HealthSystem. *Id.* at ¶ 21. Remied worked at a NorthShore location in Skokie, Illinois from 2017 to 2020. *Id.*

NorthShore includes six hospitals and a 900-physician group practice with over 140 locations in the Chicago area. *Id.* at ¶ 26. It employs 17,000 people. *Id.*

Like many employers, NorthShore sponsors a defined contribution pension plan for its employees. *Id.* at ¶ 5. This plan is a 403(b) plan known as the NorthShore University

HealthSystem Tax Deferred Annuity Plan, or the "NorthShore Plan." *Id.* Remied is a participant in the Plan. *Id.* at ¶ 20.

The NorthShore Plan had 11,669 participants in 2020, with almost $1.8 billion in assets. *Id.* at ¶¶ 30–31. The Plan had more assets and more participants than 99.85% of the defined contribution plans in the United States that year. *Id.* at ¶ 31.

Two committees serve as the Plan Administrators: the Retirement Plan Administrative Committee ("RPAC"), and the Retirement Plan Investment Committee ("RPIC"). *Id.* at ¶ 28. The Plan Administrators are responsible for the day-to-day operation of the Plan, including the control, management, and administration of the Plan. *Id.*

Gerald Gallagher, as President and CEO of NorthShore, appoints Plan fiduciaries to the Committees and has the power to remove them. *Id.* at ¶ 27. NorthShore and Gallagher are also fiduciaries of the Plan. *Id.*

NorthShore contracted with Voya Retirement Insurance & Annuity to provide recordkeeping services during the proposed Class Period. *Id.* at ¶¶ 49, 77. Voya has been the recordkeeper for the Plan since at least 2002. *Id.* at ¶ 6.

Voya provided a standard package of RKA services to the NorthShore Plan. *Id.* at ¶ 49. Remied alleges that "virtually every major recordkeeper provide[s] the same core services as Voya does to NorthShore." *Id.* at ¶ 60. In fact, "Voya provided materially identical services as the standard package of RKA services provided by all recordkeepers to mega plans and did not provide any higher level or quality of service." *Id.* at ¶ 81.

Nothing in the administrative service agreements between NorthShore and Voya suggests that Voya provided any unusual services or did anything that went above and beyond the standard RKA services. *Id.* at ¶ 67.

6

Remied participated in the plan and invested his money by selecting from the menu of options. *Id.* at ¶ 21. But he was unhappy with the expenses paid, and the investment options offered, by the plan. So he sued.

In a nutshell, Remied alleged that the Plan fiduciaries breached ERISA's duty of prudence in two ways. First, the complaint alleged that the Plan fiduciaries paid excessive recordkeeping fees to the Plan's recordkeeper, Voya. Remied claimed that the excessive fees paid to Voya for bundled RKA services led to lower net returns than participants received in comparable plans. *Id.* at ¶ 82.

Second, the complaint alleged that the Plan fiduciaries offered high-cost investment options to Plan participants. Other possible investments in the same category had a lower cost. *Id.* at ¶¶ 1–15.

### *The Amended Complaints*

After Remied filed the complaint, the Seventh Circuit decided *Albert v. Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022). The Seventh Circuit in *Albert* affirmed the dismissal of breach of fiduciary duty claims under ERISA. (More on *Albert* later.)

Remied requested and received leave of court to file an amended complaint in light of the Seventh Circuit's decision in *Albert*. Remied then filed an amended complaint. *See* Am. Cplt. (Dckt. No. 21). In response, Defendants moved to dismiss. *See* Mtn. to Dismiss Am. Cplt. (Dckt. No. 24).

Remied then requested and received leave to file a second amended complaint, which is the operative pleading. *See* Second Am. Cplt. (Dckt. No. 29). The second amended complaint includes four counts.

The first two counts are against the two committees that run the Plan as the administrators, meaning the Retirement Plan Administrative Committee and the Retirement Plan Investment Committee (collectively, the "Plan Committee Defendants"). The latter two counts are against the company itself and its CEO.

Count I alleges that the Plan Committee Defendants breached ERISA's duty of prudence by paying Voya excessive recordkeeping fees. *Id.* at ¶¶ 173–83.

Count II alleges that the Plan Committee Defendants breached ERISA's duty of prudence by selecting and retaining mutual funds with high expenses as Plan investment options. *Id.* at ¶¶ 184–96.

Putting them together, Remied believes that the Plan Committee Defendants rang up too large of a tab, and put unsavory items on the menu.

The next two counts are similar. The main difference is that Remied brings Counts III and IV against the company and its CEO. And the theory involves the duty to monitor.

Count III alleges that NorthShore and Gallagher failed to adequately monitor the Committees for the excessive recordkeeping fees (as alleged in Count I). *Id.* at ¶¶ 197–203.

Count IV alleges that NorthShore and Gallagher failed to adequately monitor the Committees for the high expense investment options (as alleged in Count II). *See id.* at ¶¶ 204–10.

Remied seeks to represent a putative class of all participants and beneficiaries of the NorthShore University HealthSystem Tax Deferred Annuity Plan from May 16, 2016 through the date of judgment. *Id.* at ¶ 160.

Defendants, in turn, moved to dismiss the second amended complaint in its entirety, with prejudice. *See* Mtn. to Dismiss Pl.'s Second Am. Cplt. (Dckt. No. 35).

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case.  *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor.  *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *See Iqbal*, 556 U.S. at 678.

## Analysis

ERISA imposes a duty of prudence on plan fiduciaries.  Plan fiduciaries must perform their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use . . . ."  *See* 29 U.S.C. § 1104(a)(1).

ERISA provides a private right of action for breach of a fiduciary duty.  *See Albert v. Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022), *reh'g denied*, 2022 WL 4372363 (7th Cir. 2022); *see also* 29 U.S.C. § 1132(a)(2).  In ERISA class actions, Rule 12(b)(6) motions are an "important mechanism for weeding out meritless claims."  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  Courts apply a "careful, context-sensitive scrutiny of a complaint's allegations" to "divide the plausible sheep from the meritless goats."  *Id*.

An ERISA claim has familiar elements: duty, breach, and harm. To state a claim for breach of fiduciary duty under ERISA, a plaintiff must plead that: (1) the defendant is a plan fiduciary; (2) the defendant breached its fiduciary duty; and (3) the breach resulted in harm to the plaintiff. *See Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016).

Basically, Remied contends that the Plan Committee Defendants breached their fiduciary duty of prudence in two ways. First, they paid excessive fees for recordkeeping services (Count I). Second, they larded the menu by including high-cost funds in the Plan's investment options (Count II). And then, the company and its CEO dropped the ball by failing to monitor the committees (Counts III and IV).

## I.    *Hughes I & II*

The Supreme Court and the Seventh Circuit recently addressed ERISA's duty of prudence in a case brought by employees of Northwestern University. So, before drilling into Remied's claims, the Court will survey the field by summarizing those decisions.

The case involved allegations that Northwestern had breached its fiduciary duties in a number of different ways, including by using a recordkeeper who charged excessive fees. *See Divane v. Nw. Univ.*, 953 F.3d 980, 988 (7th Cir. 2020), *vacated and remanded sub nom. Hughes v. Nw. Univ.*, 595 U.S. 170, 142 S. Ct. 737 (2022), *opinion reinstated on reconsideration sub nom. Hughes v. Nw. Univ.*, 63 F.4th 615 (7th Cir. 2023). Plaintiffs also alleged that Northwestern had breached its duties by offering "investment options that were too numerous, too expensive, or underperforming." *Id.* at 991.

The lower court dismissed the claims, and the Seventh Circuit affirmed that decision in *Divane*. The Supreme Court later reversed (*Hughes I*), and the Seventh Circuit then issued a second decision (*Hughes II*).

10

In *Divane*, the Seventh Circuit upheld the dismissal of the claims because the participants had the freedom to choose low-cost options. Participants could avoid the high cost of certain investment options "simply by choosing from hundreds of other options within a multi-tiered offering system." *Id.* at 988. And in fact, Northwestern made the preferred, low-cost options available to the plaintiffs. In the Seventh Circuit's view, the availability of palatable alternatives "eliminat[ed] any claim that plan participants were forced to stomach an unappetizing menu." *Id.* at 991.

The Supreme Court reversed, and made clear that the mere existence of investor choice is not enough to eliminate a claim as a matter of law. *See Hughes v. Nw. Univ.*, 595 U.S. 170 (2022) ("*Hughes I*"). "Such a categorical rule is inconsistent with the context-specific inquiry that ERISA requires and fails to take into account respondents' duty to monitor all plan investments and remove any imprudent ones." *Id.* at 173.

"Even in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options. If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Id.* at 176.

An investor's ability to shop from a menu does not prevent a claim about something that shouldn't have been on the menu at all. Put another way, "ERISA does not allow the soundness of investments A, B, and C to excuse the unsoundness of investments D, E, and F." *See Albert*, 47 F.4th at 575.

By way of analogy, imagine if an elementary school wanted to offer kids a menu of healthy snacks. And then, imagine if the cafeteria offered the kids the following four choices:

(1) apple slices, (2) carrots, (3) trail mix, and (4) a family-size bag of Doritos.  (Whoever put Doritos on the menu would get voted Teacher of the Year.)  The presence of good options doesn't excuse the presence of a bad option.

On remand, the Seventh Circuit revisited the requirements for pleading a claim about a breach of the duty of prudence.  *See Hughes v. Nw. Univ.*, 63 F.4th 615 (7th Cir. 2023) ("*Hughes II*").  The Seventh Circuit reexamined the recordkeeping claim, and the claim about the failure to remove imprudent investment options.

The Seventh Circuit first addressed the "continuing duty" of plan fiduciaries to monitor expenses.  *Id.* at 625.  Fiduciaries do not have a duty to "constantly solicit quotes for recordkeeping services to comply with its duty of prudence."  *Id.* at 625–26.  But fiduciaries can violate the duty of prudence if they "fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees – such as by adjusting fee arrangements, soliciting bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means."  *Id.* at 626.

The Seventh Circuit then turned to the claim about the menu offerings.  Fiduciaries have a "'continuing duty to monitor trust investments and remove imprudent ones . . . separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset.'"  *Id.* (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015)).  "This continuing duty to monitor is a subset of the duty of prudence."  *Id.*

By way of analogy, the duty to monitor is something like cooking a vat of homemade tomato sauce on the stovetop.  You can't simply make the sauce, turn the heat on full blast, and then leave the kitchen.  Bad things will happen.  But you don't have to stir the sauce every

minute of the day, either. You do need to check on it every now and again, to make sure that everything is under control.

*Hughes II* sharpened the pleading standard for a claim about the duty of prudence under ERISA. *See id.* at 628–30. "To plead a breach of the duty of prudence under ERISA, a plaintiff must plausibly allege fiduciary decisions outside a range of reasonableness." *Id.* at 630. That is, a complaint must contain enough factual content to plausibly allege imprudent conduct.

To bring a claim about high recordkeeping fees and imprudent investments, a plaintiff must allege "enough facts to show that a prudent fiduciary would have taken steps to reduce fees and remove some imprudent investments." *Id.* at 628.

A complaint does not need to affirmatively establish that a better course of action was "actually available." *Id.* at 630. By the same token, a complaint does not need to rule out "reasonable explanations" for the failure by the ERISA fiduciary to take that action. *Id.* at 627–28. That is, a complaint does not need to "conclusively rule out every possible alternative explanation for a defendant's conduct, no matter how implausible." *Id.* at 629.

When it comes to the pleadings, plausibility is the key. "At the pleadings stage, a plaintiff must provide enough facts to show that a prudent alternative action was plausibly available, rather than actually available." *Id.*

Alternative explanations for the fiduciary's conduct "need not be conclusively ruled out at the pleadings stage." *Id.* But when there is an "obvious alternative explanation" suggesting that an ERISA fiduciary's conduct reflects reasonable judgment based on the fiduciary's experience and expertise, "something 'more' is necessary to survive dismissal." *Id.* (quoting *Twombly*, 550 U.S. at 554). A district court "should not hesitate to dismiss an ERISA claim for breach of the duty of prudence" when "an alternative explanation for an ERISA fiduciary's

13

conduct" is "patently more reasonable and better supported by the facts than any theory of fiduciary duty violation pleaded by a plaintiff." *Id.* at 630.

"To the extent that the prudent course of action was unavailable, that will foreclose the claim. But if a course of action was only possibly unavailable, further factual development on the pleadings will be necessary to resolve the claim on that explanation." *Id.*

The complaint in *Hughes II* satisfied that pleading standard. The plaintiffs in *Hughes II* alleged that numerous recordkeepers existed in the marketplace who were equally capable of providing a high level of service to large defined contribution plans like the Northwestern plan. *Id.* at 632. The plaintiffs sufficiently alleged that cheaper alternatives were available to Northwestern. *Id.* And yet Northwestern "paid about four to five times as much in recordkeeping fees as they should have." *Id.* at 636; *see also id.* at 621, 632.

The Seventh Circuit went on to explain why the claims survived in *Hughes II*, but the claims failed in *Albert*. In *Albert*, the plaintiffs failed to allege the quality or type of recordkeeping services offered by comparator plans. *Id.* at 632. But the plaintiffs in *Hughes II* filled that hole.

Unlike in *Albert*, the plaintiffs in *Hughes II* "maintain that the quality or type of recordkeeping services provided by competitor providers are comparable to that provided by" Northwestern's plan. *Id.* The plaintiffs in *Hughes II* also alleged that recordkeeping services were fungible, and that the market for them was highly competitive. *Id.*

Basically, it was an apples-to-apples comparison. And cheaper apples were available from another seller down the block.

The Seventh Circuit in *Hughes II* closed its opinion by addressing Northwestern's explanations for the high recordkeeping fees. Northwestern argued that the plan's recordkeeping

fee arrangements encouraged participation by small investors in its plan and offered a popular product to participants. *Id.* at 633. The Court of Appeals acknowledged the possibility of "reasonable alternative explanations," but concluded that they were "not strong enough to justify dismissal of the recordkeeping claim on the pleadings." *Id.*

The Court of Appeals ended with an important reminder. "In reaching this conclusion, we reiterate that the inquiry into the duty of prudence is in all cases 'context specific.'" *Id.* at 633–34 (internal citation omitted). That is, "[c]laims for excessive recordkeeping fees in a future case may or may not survive dismissal based on different pleadings and the specific circumstances facing the ERISA fiduciary. But here, plaintiffs have pleaded enough to cross the line from possibility to plausibility." *Id.*

The Supreme Court also had something to say about high-cost investment options in *Hughes I*. One of the ways that the plaintiffs in *Divane* pleaded that Northwestern violated the duty of prudence was that "respondents allegedly offered a number of mutual funds and annuities in the form of 'retail' share classes that carried higher fees than those charged by otherwise identical 'institutional' share classes of the same investments." *See Hughes I*, 595 U.S. at 175.

*Hughes I* did not change Seventh Circuit law that "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund." *See Hughes II*, 63 F.4th at 625. But "ERISA requires a fiduciary to assess whether a given fund is prudent in light of other investment options in a plan, comparable funds, and the expenses charged, among other factors." *Id.*

The plaintiffs in *Divane* pleaded that "Northwestern breached its duty of prudence by failing to replace retail-class shares of funds with cheaper but otherwise identical institutional-class shares." *Id.* at 634. "Institutional and retail shares differ only in that retail shares have

15

higher expenses" because institutional shares have minimum investment thresholds. *Id.* Although other large plans negotiated for waivers to the minimum investment thresholds, Northwestern did not. *Id.* "Other fiduciaries had successfully negotiated for including institutional-class shares in their plans despite not meeting the minimum investment requirements." *Id.*

Northwestern, for its part, argued that the institutional-class shares were unavailable due to their investment requirements. *Id.* at 636. Northwestern also argued that retail shares had other benefits, like defraying recordkeeping costs. *Id.*

But in the end, these arguments were "not strong enough to overcome the equally, if not more, reasonable inference that Northwestern failed to use its size to bargain for cheaper institutional shares." *Id.* So, plaintiffs were able to state a claim for breach of the duty of prudence.

## II.    Recordkeeping Fees (Count I)

With that background in mind, the Court turns to the claims brought by Remied about the NorthShore Plan.

The first claim is about recordkeeping fees. Remied alleges that the Committee Defendants breached their fiduciary duty of prudence by paying excessive recordkeeping fees to Voya. *See* Second Am. Cplt., at ¶ 98 (Dckt. No. 29).

The question is whether Remied has pleaded enough factual content to plausibly allege that a prudent fiduciary would have taken steps to reduce fees. Based on Seventh Circuit precedent, he has.

According to Remied, Defendants paid "objectively unreasonable" bundled RKA fees to Voya. *Id.* at ¶ 100. A prudent fiduciary would have regularly solicited quotes from

recordkeepers to avoid paying unreasonable fees. *Id.* But Defendants did not regularly solicit quotes or competitive bids from service providers. *Id.* at ¶ 99. By failing to keep an eye on the proverbial store, Defendants did not follow a prudent fiduciary process to ensure that the Plan paid reasonable fees. *Id.* at ¶¶ 100, 108.

Like the plaintiffs in *Hughes II*, Remied gave examples of comparator plans. He identified the recordkeeping fees paid by other plans, and compared them to the fees paid by the NorthShore Plan.

Remied estimated the total bundled RKA fees that the NorthShore Plan paid each year from 2016 to 2020. *Id.* at ¶ 104. By dividing the estimated total fee ($1,110,876) by the average number of participants each year (10,383), he estimated an average fee per participant across the five years. *Id.* The average fee per participant for the bundled RKA services was $107. *Id.*

Then, Remied compared the average fee per participant paid to Voya with the fees paid by seven other "comparable plans of similar sizes with similar amounts of money under management, receiving at least the same level and quality of service for less" in 2018. *Id.* at ¶ 105.

The seven comparator plans had a comparable number of participants, ranging from 8,067 participants (on the low end) to 13,502 participants (on the high end). *Id.* NorthShore was right in the middle, with 10,383 participants. *Id.* But NorthShore did have the most assets ($1,438,299,630). *Id.* The assets of the other plans ranged from $5.5 million to almost $1.3 billion.

The complaint got granular, too. The complaint calculated the fees charged to seven other plans by four other recordkeepers: Vanguard, Fidelity, T. Rowe Price, and Great-West. *Id.* The per-participant RKA fee ranged from $31 to $42. *Id.* at ¶ 107.

Specifically, Vanguard charged one plan $42 in fees, and charged the other plan $31. *Id.* Fidelity charged one plan $36, and charged the other plan $35. *Id.* T. Rowe Price charged $31. *Id.* And Great-West charged $33 and $31, respectively. *Id.* No other plan used Voya as a recordkeeper. *Id.* at ¶ 105.

Doing a little math, the comparable plans paid an average of only $34 per participant in recordkeeping fees. *Id.* at ¶ 113; *see also id.* at ¶ 105. But NorthShore paid fees totaling $107 per participant. *Id.* at ¶¶ 104–05. That's three times as much.

Remied also included a second comparison. This time, he pointed to fees as a percentage of the assets of the Plan, instead of fees per participant.

NorthShore had $1,438,299,630 in assets, with 10,383 participants. *Id.* at ¶¶ 105, 125. NorthShore paid $1,110,876 in fees. *Id.* That's an average of $107 in RKA fees per participant. *Id.* Doing a little more math ($1,110,876 in fees ÷ $1,438,299,630 in assets), NorthShore paid a fee rate of 0.0772%. *Id.* at ¶ 125.

That's well above the fee rate charged by recordkeepers in four other plans. According to the complaint, Fidelity is the recordkeeper for three other plans, and charged fee rates of 0.0105%, 0.0493%, and 0.0137%, respectively. *Id.* Schwab, another recordkeeper, charged a fourth plan a fee rate of 0.0384%.

As Remied sees things, the NorthShore plan paid too much for recordkeeping. That's true whether the yardstick is measuring things in absolute terms (*i.e.*, a fee of $107 per participant), or in percentage terms (*i.e.*, a fee rate of 0.0772%). "Under either comparison model, Defendants could have offered the exact same RKA services, at the same level and quality, at a more reasonable cost by using a different recordkeeper but did not do so." *Id.* at ¶ 128.

Viewing those allegations as a whole, Remied sufficiently alleges that alternative options were plausibly available to the NorthShore Plan.  The second amended complaint alleges that Defendants had tools at their disposal to cut a better deal.  They could have negotiated a better fee, or walked away and used another recordkeeper.  *Id.* at ¶¶ 90, 96.  The Plan could have used its size to its advantage.  *Id.* at ¶ 130.  Instead, the Plan stuck with Voya, and got stuck with inflated fees.

Defendants take issue with the comparisons.  They don't agree with Remied's choice of comparator plans, or with his calculations of RKA fees.  *See* Mem. in Supp. of Mtn. to Dismiss, at 7 (Dckt. No. 36).  Defendants also contend that they have negotiated multiple reductions to Voya's fee rate since 2017.  *Id.* at 6.

Defendants rely on *Albert*, but it cannot come to the rescue.  Again, in *Albert*, the Seventh Circuit affirmed the dismissal of claims for breach of fiduciary duty of prudence for authorizing unreasonably high RKA fees.  *See Albert*, 47 F.4th at 573.  The *Albert* plaintiff, like Remied, compared data from nine other plans to show that his plan paid a significantly higher RKA fee per participant.  *Id.* at 579.  But the complaint in *Albert* failed to allege anything about the quality or type of recordkeeping services provided to the comparator plans.  *Id.*

Ultimately, the plaintiff's allegations in *Albert* did not provide enough facts to plausibly plead a breach of the duty of prudence.  *Id.* at 580.  But the Seventh Circuit acknowledged that "recordkeeping claims in a future case could survive the 'context-specific scrutiny of a complaint's allegations' courts perform on a motion to dismiss."  *Id.* (quoting *Dudenhoeffer*, 573 U.S. at 425).

In *Hughes II*, the Seventh Circuit showed how a recordkeeping claim can survive "context-specific scrutiny."  *See Hughes II*, 63 F.4th at 632.  Hughes alleged that numerous

recordkeepers were in the marketplace and provided a similar level of service to large defined contribution plans. As a result, that complaint plausibly alleged that Northwestern breached its duty of prudence when it continued to pay fees four to five times higher than was reasonable. *Id.*

The complaint filed by Remied is more similar to the complaint in *Hughes II* than the complaint in *Albert*. Remied alleged that recordkeeping services are like a commodity, and that all service providers provide a similar quality of service. Those allegations were missing in *Albert*. *See Tolomeo v. R.R. Donnelley & Sons, Inc.*, 2023 WL 3455301, at *4 (N.D. Ill. 2023) ("Allegations that recordkeeping services for mega 401(k) plans are fungible, and the same services could have been provided by other comparator recordkeepers were missing in *Albert*.").

Defendants have failed to provide the type of reasonable alternative explanations for the Plan's high recordkeeping fees that the Seventh Circuit considered in *Hughes II*. And in any event, the alternative explanations offered by Northwestern in *Hughes II* weren't enough to defeat the motion to dismiss.

Defendants contend that the quality of service that Voya provides is important to "a diverse employee population like NorthShore's, which ranges from hourly staff to doctors and other skilled professions, across six hospital campuses and more than 140 locations." *See* Mem. in Supp. of Mtn. to Dismiss, at 12 (Dckt. No. 36).

Maybe so. But at this point, the question is simply whether the complaint contains enough factual material to put the ball in play. At this early stage, Remied has plausibly alleged that the level of service provided by national recordkeepers is comparable across service providers. *See* Second Am. Cplt., at ¶¶ 128–29, 136 (Dckt. No. 29).

So, Remied has alleged that recordkeeping services are considered a commodity in the industry. He alleged that the services do not differ greatly between providers, and that plausible

alternative options existed with much lower fees per participant.  To top it off, Remied alleged that the NorthShore Plan paid Voya excessive fees for its recordkeeping services compared to reasonable alternatives.

Remied has offered enough factual content to allege a plausible claim.  Maybe the claim will fall apart someday, but at this early stage, the complaint has enough of a footing to survive the motion to dismiss.

The complaint adequately alleges that the Plan is paying too many bucks for the bang. The motion to dismiss the claim about excessive recordkeeping fees (Count I) is denied.

## III.    High-Cost Investment Options (Count II)

The second claim is about the investment options that the NorthShore Plan made available to the participants.  As Remied sees it, the Plan put unsavory fare on the menu, and it was full of fillers.

Again, it all goes back to the duty of prudence.  A plan fiduciary must perform its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use . . . ."  *See* 29 U.S.C. § 1104(a)(1).

Remied alleges that the Committee Defendants breached their duty of prudence by selecting investment options with unreasonably high expense ratios, and making those investments available to participants.  The basic idea is that the Plan could have selected investments with lower expense ratios within each investment category.

The investment offerings at issue fall within six investment categories under the Morningstar classification system.  "The Morningstar Category™ classification system for funds lets institutions, advisers and investors effectively compare like funds."  *See Morningstar*

*Category Definitions*, https://www.morningstar.com.au/learn/investing/225136/morningstar-category-definitions (last visited June 28, 2024).  Basically, Morningstar places funds into groups, and each group contains "funds which can be reasonably considered to be close investment alternatives, and for which performance and other statistical measures, such as fees, are comparable."  *Id.*

By way of analogy, think of the Morningstar categories as types of food in a grocery store.  One category might be "sugary but delicious breakfast cereal."  Another category might be "tomato sauce," and a third category might be "ice cream bars."  And so on.  The category contains a swath of possible offerings.

A plan administrator is a little like a shopper at a grocery store.  The administrator has a universe of potential options in each category within his or her reach.  The plan administrator walks down each aisle, does a little shopping, and puts some of the possibilities into the shopping cart.  And then, the employees pick from what's in the shopping cart.  The plan administrator selects options for the employees to choose from.

So, imagine if the category is "sugary but delicious breakfast cereals."  The plan administrator might go down the aisle, and select Fruity Pebbles, Lucky Charms, Trix, and Froot Loops.  And then, the plan administrator would make those cereals available to the employees, who can pick and choose what they want for breakfast (or dinner).

An employee would have to choose from the offerings picked by the plan administrator.  An employee can't select a cereal that isn't on the menu, even if the employee craves something different.  If an employee wanted Cocoa Puffs, and if it's not in the shopping cart, that employee is out of luck.

Remied's complaint makes that type of claim in the second count.  Remied alleges that the plan administrators selected investments with a high expense ratio when a cheaper option was available within each Morningstar category.

For example, consider the "US Fund Diversified Emerging Markets" category.  The Plan offered participants the chance to invest in a fund called "Harding Loevner Institutional Emerging Markets I."  That investment had a net investment expense percentage of 1%.  *See* Second Am. Cplt., at ¶ 146 (Dckt. No. 29).

As Remied sees it, a cheaper option was available.  The Plan could have offered another investment within the "US Fund Diversified Emerging Markets" category, called the "American Funds New World R6."  *Id.*  And that fund had a net investment expense percentage of only 0.57%.  So, it's a lower-cost investment.

Putting them together, Remied alleges that the Plan offered a pricey investment with high expenses in the "US Fund Diversified Emerging Markets" category.  The Plan let participants invest in the Harding Loevner Institutional Emerging Markets I, with a net investment expense percentage of 1%.  But in Remied's view, the Plan should have let participants invest in the American Funds New World R6, with a net investment percentage of only 0.57%.

The difference between 1% and 0.57% may not seem like much.  But according to Remied's math (which seems to check out),[1] the expense percentage of Harding Loevner Institutional Emerging Markets I (*i.e.*, 1%) is 75% higher than the expense percentage of American Funds New World R6 (*i.e.*, 0.57%).

---

[1] Remied didn't explain the math.  As the Court understands things, the expense percentage of one fund was 1%, and the expense percentage of the other fund was 0.57%.  The difference between 1% and 0.57% is 0.43%.  And 0.43% is 75% of 0.57%.  So, one fund (with an expense ratio of 1%) had an expense ratio that was 75% higher than the other fund (with an expense ratio of 0.57%).

Remied goes through the same exercise for the five other investment categories. The Plan offered more-expensive Investment X, but could have offered less-expensive Investment Y. And by offering an investment option with higher expenses, Defendants allegedly breached their duty of prudence.

Putting it all together, Remied alleges that Defendants selected six investments in the six investment categories with an average expense percentage of 0.71%. But another investment was potentially available in each of those six categories, and the alternative investment had an average expense percentage of only 0.43%. That is, the Plan paid an expense percentage of 0.71% for those six investments, but could have paid an expense percentage of 0.43%. So, doing a little math, the Plan paid 85% more in fees than it should have (meaning that paying 0.71% is 85% more than paying 0.43%).

The claim suffers from a few problems.

At its core, the thrust of the claim is that plan administrators could have selected a less expensive option. That allegation, without more, is not enough to give rise to a claim for breach of the duty of prudence. "[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund." *See Hughes II*, 63 F.4th at 625 (citation omitted).

ERISA does not require plan fiduciaries to offer the cheapest available fund. "Plan administrators . . . have considerable discretion in choosing their offerings and do not have to pick the lowest-cost fund of a certain type where the long-run performance of another fund has the reasonable prospect of surpassing it." *See Forman v. TriHealth, Inc.*, 40 F.4th 443, 449 (6th Cir. 2022) (Sutton, C.J.).

The Seventh Circuit "has repeatedly emphasized that the cheapest investment option is not necessarily the one a prudent fiduciary would select." *See Albert v. Oshkosh Corp.*, 47 F.4th

570, 579 (7th Cir. 2022); *see also Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*, 46 F.4th 535, 548 (7th Cir. 2022) (rejecting a claim when "[a]ll plaintiffs have shown is that two other defined-contribution plans allegedly have lower expenses and fees"); *Loomis v. Exelon Corp.*, 658 F.3d 667, 670 (7th Cir. 2011); *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009); *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 912 (7th Cir. 2013) (recognizing that "the cheapest option may not inevitably be the best option"); *Gaines v. BDO USA, LLP*, 663 F. Supp. 3d 821, 831 (N.D. Ill. 2023); *Martin v. CareerBuilder, LLC*, 2020 WL 3578022, at *3 (N.D. Ill. 2020).

The reason is simple. "At times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 595 U.S. at 177.

Cheaper is sometimes better, but sometimes cheaper is just cheaper. That's true when it comes to just about anything. Try going out for a burger with a group of friends. The group might not rally around the person who wants to find the cheapest possible burger. Other people might have different views about what's the best burger, and it may not be the *cheapest* burger.

That's true when it comes to investments, too. And that's why ERISA gives plan administrators room to maneuver and exercise their discretion. It might be prudent to look at a less expensive option, and take a pass.

In a similar vein, the complaint does not offer sufficient facts to allege that the other funds were comparable. Basically, for each Morningstar category, Remied points to one (and *only* one) other fund that had lower expense ratios. That's about it. The basis for a comparison comes to an abrupt, screeching halt.

"A complaint cannot simply make a bare allegation that costs are too high, or returns are too low. . . . Rather, it must provide a sound basis for comparison – a meaningful benchmark." *See Albert v. Oshkosh Corp.*, 47 F.4th 570, 581 (7th Cir. 2022) (quoting *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 484 (8th Cir. 2020)) (cleaned up). "A court cannot reasonably draw an inference of imprudence simply from the allegation that a cost disparity exists; rather, the complaint must state facts to show the funds or services being compared are, indeed, comparable. The allegations must permit an apples-to-apples comparison." *See Matney v. Barrick Gold of North America*, 80 F.4th 1136, 1149 (10th Cir. 2023).

Remied has not pled enough to allege that the would-be comparables are actually comparable. He hasn't offered an apples-to-apples comparison. He offered an apples-to-fruit comparison.

Maybe they're comparable. Maybe they're not. There's no telling. The would-be comparables aren't comparable unless the complaint shows that they're comparable. And here, the complaint stops short of making that showing.

A raw allegation that the other investments have the "same investment approach and similar investment histories" isn't good enough. *See* Second Am. Cplt., at ¶ 146 (Dckt. No. 29); *see also id.* at ¶¶ 148–49, 153. That's a conclusion, unadorned with facts, which counts for nothing. Without "more detailed allegations providing a 'sound basis for comparison,'" the claim cannot survive. *See Albert*, 47 F.4th at 582.

Therefore, Defendants' motion to dismiss Count II is granted.

## IV. Failure to Monitor Claims (Counts III & IV)

The last two claims are duty to monitor claims. Duty to monitor claims are derivative, and thus rise and fall with the duty of prudence claims. *See Albert*, 47 F. 4th at 583.

26

The Seventh Circuit has affirmed the dismissal of duty to monitor claims where the underlying fiduciary duty claim fails. *See id.* On the flipside, where a plaintiff states a viable duty of prudence claim, courts have denied dismissal of a failure to monitor claim. *See, e.g.*, *Gaines v. BDO USA, LLP*, 663 F. Supp. 3d 821, 832 (N.D. Ill. 2023).

Here, Remied has a viable duty of prudence claim against the Committee Defendants for excessive recordkeeping fees. The parties both acknowledge that the duty to monitor claims depend on an underlying fiduciary breach. So, Count III's duty to monitor claim against NorthShore and Gallagher survives.

Remied does not, however, have a viable claim for breach of the duty of prudence related to the high-cost investment fund options. Therefore, the duty to monitor claim in Count IV fails.

This Court grants Defendants' motion to dismiss Count IV but denies the motion to dismiss Count III.

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss the Second Amended Complaint is granted in part and denied in part. The Court grants the motion to dismiss Counts II and IV, but denies the motion to dismiss Counts I and III.

Date: July 1, 2024

Steven C. Seeger
United States District Judge